## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## WACO DIVISION

| | | |
|---|---|---|
| **SVV TECHNOLOGY INNOVATIONS INC.** | § § § | |
| *Plaintiff*, | § § | |
| v. | § § | **Civil Action No.  6:24-cv-536** |
| **ACER INC.** | § § § | **JURY DEMANDED** |
| *Defendant*. | § § § | |

## PLAINTIFF'S COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff SVV Technology Innovations Inc. ("SVVTI" or "Plaintiff") files this Complaint for patent infringement against Acer Inc. ("Acer" or "Defendant").  Plaintiff alleges infringement of United States Patent Numbers 8,740,397 ("'397 Patent"); 9,678,321 ("'321 Patent"); 10,613,306 ("'306 Patent"); 10,868,205 ("'205 Patent"); and 11,616,157 ("'157 Patent"); collectively, the "Asserted Patents."

## RELATEDNESS TO OTHER CASES

1.      This action is related to other actions considered by the District Court for the Western District of Texas, Waco Division, under Judge Alan D Albright. Specifically, SVVTI asserted the '397 Patent, '321 Patent, '306 Patent, and '205 Patent in other actions that it had previously filed in in the Waco Division, and the Waco Division Court had construed claims of those patents. The Waco Division Court had also considered numerous motions, including discovery motions and dispositive motions, and resolved disputes between parties relating to the technology at issue in these patents.

The following is a list of SVVTI actions involving the '397 Patent and '321 Patent considered by the Waco Division Court:

- *SVV Technology Innovations, Inc. v. ASUSTeK Computer Inc.*, No. 6:22-cv-312-ADA (through pre-trial, currently pending)
- *SVV Technology Innovations, Inc. v. Acer Inc.*, No. 6:22-cv-640-ADA (**through jury trial,** currently pending)
- *SVV Technology Innovations, Inc. v. Micro-Star International Co., Ltd.*, No. 6:22-cv-512-ADA (through claim construction)

The following is a list of SVVTI actions involving the '306 Patent considered by the Waco Division Court:

- *SVV Technology Innovations, Inc. v. ASUSTeK Computer Inc.*, No. 6:22-cv-313-ADA (through pre-trial, currently pending)
- *SVV Technology Innovations, Inc. v. Acer Inc.*, No. 6:22-cv-641-ADA (through pre-trial, currently pending)
- *SVV Technology Innovations, Inc. v. Micro-Star International Co., Ltd.*, No. 6:22-cv-513-ADA (through claim construction)

The following is a list of SVVTI actions involving the '205 Patent considered by the Waco Division Court:

- *SVV Technology Innovations, Inc. v. ASUSTeK Computer Inc.*, No. 6:22-cv-313-ADA (through pre-trial, currently pending)
- *SVV Technology Innovations, Inc. v. Acer Inc.*, No. 6:22-cv-640-ADA (**through jury trial**, currently pending)
- *SVV Technology Innovations, Inc. v. Micro-Star International Co., Ltd.*, No. 6:22-cv-512-ADA (through claim construction)

In addition, the '157 Patent is related to the '205 Patent, in that the '157 Patent is a continuation of application No. 17/119,487, now Patent No. 11,276,795, which is a continuation of application No. 16/585,550, now the '205 Patent.

## **PARTIES**

2.    Plaintiff SVVTI is a California corporation with a place of business 1832 Tribute Road, Suite C, Sacramento, California 95815.

3.     On information and belief, Acer Inc. is a corporation organized and existing under the laws of Taiwan with a principal place of business at 8F., No.88, Sec. 1, Xintai 5th Rd., Xizhi Dist., New Taipei City 221, Taiwan, R.O.C.

## JURISDICTION AND VENUE

4.     This is an action for patent infringement arising under the patent laws of the United States, Title 35, United States Code.  Jurisdiction as to these claims is conferred on this Court by 35 U.S.C. §§1331 and 1338(a).

5.     This Court has personal jurisdiction over Acer because, directly or through intermediaries, each has committed acts within the Western District of Texas giving rise to this action and/or has established minimum contacts with the Western District of Texas such that the exercise of jurisdiction would not offend traditional notions of fair play and substantial justice.

6.     Acer has placed or contributed to placing infringing products into the stream of commerce via an established distribution channel knowing or understanding that such products would be sold and used in the United States, including in the Western District of Texas.

7.     This Court has specific personal jurisdiction over Acer at least in part because Acer conducts business in this Judicial District. SVVTI's causes of action arise, at least in part, from Defendant's contacts with and activities in the State of Texas and this Judicial District. The exercise of jurisdiction over Acer would not offend traditional notions of fair play and substantial justice. Defendant Acer, directly and/or through subsidiaries or intermediaries (including distributors, retailers, and others), has committed and continues to commit acts of infringement in this District by, among other things, offering to sell and selling products and/or services that infringe the patents-in-suit, including the accused devices as alleged herein.

8.     On information and belief, Acer also has derived substantial revenues from infringing acts in this Judicial District, including from the sale and use of infringing products including, but not limited to, the products accused of infringement below.

9.     On information and belief, Acer maintains authorized sellers and sales representatives that offer and sell products pertinent to this Complaint throughout the State of Texas, including this District and to consumers throughout this District.

10.    Defendant has established minimum contacts with this forum such that the exercise of jurisdiction over Defendant would not offend traditional notions of fair play and substantial justice.

11.    Venue in this Judicial District is proper as to Acer under 28 U.S.C. § 1391(c)(3) because it is a foreign corporation. Defendant has committed acts within this judicial district giving rise to this action, and Defendant continues to conduct business in this judicial district, including one or more acts of selling, using, importing and/or offering for sale infringing products or providing service and support to Defendant's customers in this District. This district is familiar with the technology of the Patents-in-Suit having presided over another lawsuit involving the Patents-in-Suit.

12.    In addition, Defendant has knowingly induced and continues to knowingly induce infringement within this District by advertising, marketing, offering for sale and/or selling devices pre-loaded with infringing functionality within this District, to consumers, customers, manufacturers, distributors, resellers, partners, and/or end users, and providing instructions, user manuals, advertising, and/or marketing materials which facilitate, direct or encourage the use of infringing functionality with knowledge thereof.

13.     Personal jurisdiction also exists specifically over Defendant because Defendant, directly or through affiliates, subsidiaries, agents, or intermediaries, transacts business in this State or purposefully directed at this State (including, without limitation, retail stores including Best Buy and Walmart) by making, importing, offering to sell, selling, and/or having sold infringing products within this State and District or purposefully directed at this State or District.

14.     In addition, Defendant, directly or through affiliates, subsidiaries, agents, or intermediaries, places infringing products into the stream of commerce knowing they will be sold and used in Texas, and economically benefits from the retail sale of infringing products in this State. For example, Defendant's products have been sold and are available for sale in this District at Best Buy and Walmart retail stores and are also available for sale and offered for sale in this District through online retailers such as Best Buy, Walmart, and Amazon.

15.     Via Defendant's agents, intermediaries, distributors, importers, customers, and/or consumers maintaining a business presence, operating in, and/or residing in the U.S., Defendant's products, including products and processes accused of infringing the patents-in-suit, are or have been widely distributed and sold in retail stores, both brick and mortar and online, in Texas including within this judicial district. *See Litecubes, LLC v. Northern Light Products, Inc.*, 523 F.3d 1353, 1369-70 (Fed. Cir. 2008) ("[T]he sale [for purposes of § 271] occurred at the location of the buyer."); *see also Semcon IP Inc. v. Kyocera Corp.*, No. 2:18-cv-00197-JRG, 2019 WL 1979930, at *3 (E.D. Tex. May 3, 2019) (denying accused infringer's motion to dismiss because plaintiff sufficiently plead that purchases of infringing products outside of the United States for importation into and sales to end users in the U.S. may constitute an offer to sell under § 271(a)). For example, Defendant's products are sold to end users by online stores and at retail stores located throughout the Western District of Texas.

16.    In the alternative, the Court has personal jurisdiction over Defendant under Fed.
R. Civ. P. 4(k)(2), because the claims for patent infringement in this action arise under federal
law, Defendant is not subject to the jurisdiction of the courts of general jurisdiction of any state,
and exercising jurisdiction over Defendant is consistent with the U.S. Constitution.

## FACTUAL BACKGROUND

17.    SVVTI was founded in 2000 by Dr. Sergiy Vasylyev, a scientist and prolific
inventor.

18.    Dr. Sergiy Vasylyev has an academic background and more than 20 years of
research experience in physical sciences. He received an M.S. equivalent in Physics and
Astronomy from the Kharkiv State University, Ukraine in 1992 and a Ph.D. in Physics and
Mathematics from the Main Astronomical Observatory of National Academy of Sciences of
Ukraine in 1996. From 1996 to 1999, he worked with several major academic research institutions
and was involved in diverse research projects in the areas of space physics and solar energy. After
immigrating to the U.S., in 2000, Dr. Vasylyev founded SVV Technology Innovations, Inc. to
develop and commercialize his ideas in several technical fields ranging from optics and
information technology to solar energy and lighting.  Dr. Vasylyev is the author of approximately
eighty patents and dozens of patent applications, has had numerous talks and presentations at the
national and international conferences related to space physics, solar energy and lighting and has
authored/co-authored over 30 scientific and technical publications. Dr. Vasylyev's broad technical
expertise areas include IT/IOT, optics, photonics, lightguide-based illumination systems, solar
energy, daylighting, and solid-state lighting.

19.    Since its inception, SVVTI has been a vehicle for developing and commercializing
Dr. Vasylyev's inventions, particularly being dedicated to creating impactful technology solutions

that find utility in energy efficiency, renewable energy and certain types consumer products. One technology focus is optical advances that enhance solar energy harvesting and save energy in illumination systems.

20.     SVVTI has invented and validated several ground-breaking technology solutions and has accumulated an extensive knowledge and built a diverse IP portfolio in optics, photonics, solar energy, daylighting and solid-state lighting fields. SVVTI has received innovation awards from TechConnect, Cleantech Open, and Illuminating Engineering Society.

21.     SVVTI has developed and demonstrated several novel types of optical collectors for solar energy applications, significantly improving over the traditional technologies in terms of material intensity, concentration ratio, beam uniformity and solar-to-electric conversion efficiency.

22.     Another notable technology developed by SVVTI is a unique daylight redirecting film material (Daylighting Fabric®) which is applied to windows of a building façade to redirect natural daylight deep into the interior space for improving natural illumination and saving energy used for lighting.

23.     SVVTI has also developed and demonstrated various types of innovative wide-area illumination panels and backlights employing light guides and light emitting diodes (LEDs). These panels can be tailored for specific applications and improving various characteristics of illumination systems, including, for example, light beam diffusion, emission directionality, material efficiency, luminous efficacy, glare control, design options and aesthetics.

24.     On or about, January 29, 2021, Acer received a letter from SVVTI, dated January 22, 2021, introducing SVVTI, and notifying Acer of several of the patents identified below, and identifying several of Acer's products that utilize SVVTI's intellectual property.  In particular, the

January 22, 2021 letter identified United States Patent Nos. 8,290,318; 8,740,397; 9,678,321; 9,097,826; 9,256,007; 9,880,342; 10,269,999; 10,439,088; 10,439,089; 10,613,306; 10,627,562; 10,797,191; 10,838,135; and 10,868,205.

25.    Defendant has been aware of the '397 Patent, '321 Patent, '306 Patent, and '205 Patent since, at least, June 21, 2021 when SVVTI filed three patent infringement lawsuits against Acer, styled *SVV Technology Innovations, Inc. v. Acer Inc*., No. 6:22-cv-639-ADA (W.D. Tex.), *SVV Technology Innovations, Inc. v. Acer Inc*., No. 6:22-cv-640-ADA (W.D. Tex.), and *SVV Technology Innovations, Inc. v. Acer Inc*., No. 6:22-cv-641-ADA (W.D. Tex.). Those cases collectively accused Acer of infringement involving the '397 Patent, '321 Patent, '306 Patent, and '205 Patent.

26.    Defendant has been aware of the Asserted Patents since, at least, the filing and/or service of the original complaint in this case.

## TECHNOLOGY BACKGROUND

27.    Several of the products accused of infringement below are products that contain displays using LED-illuminated LCD technology. A LED-illuminated LCD (liquid-crystal display) is a flat-panel display that uses LED (light-emitting diode) illumination. The illumination may come from LEDs along one or more sides of the display (edge-lit) or from full-array backlighting (direct-lit). As explained below, some displays use a quantum dot enhancement film ("QDEF").

28.    Some of the monitors sold by Acer are QLED monitors. QLED stands for quantum dot LED. Acer sells monitors that use QLED technology and heavily markets them to the gaming community. Generally, quantum dots are small, semiconductor particles that have

unique optical and electronic properties, including the ability to produce pure monochromatic red, green, and/or blue light.

29.    A widespread commercial application is using a quantum dot enhancement film ("QDEF") layer to improve the LED backlighting in LCD displays. In this application, light from a blue LED backlight is converted by quantum dots to relatively pure red and green. This combination of blue, green and red light incurs less blue-green crosstalk and light absorption in the color filters after the LCD screen, thereby increasing useful light throughput and providing a better color gamut.  The QDEF layer is able to replace a diffuser used in traditional LCD backlight units.

30.    The use of quantum dots to produce monochromatic red, green and blue light is an improvement over traditional LCD backlight units which fed a blue LED through a yellow filter to create white light which was then passed through red, green and blue color filters.

## COUNT I

## DEFENDANT'S INFRINGEMENT OF U.S. PATENT NO. 8,740,397

31.    On June 3, 2014, United States Patent No. 8,740,397 entitled "Optical Cover Employing Microstructured Surfaces" was duly and legally issued after full and fair examination.  SVVTI is the owner of all right, title, and interest in and to the patent by assignment, with full right to bring suit to enforce the patent, including the right to recover for past infringement damages and the right to recover future royalties, damages, and income.  A true copy of the '397 patent is incorporated by reference herein and may be accessed at https://patents.google.com/patent/US8740397B2.

32.    The following products are accused of infringing the '397 Patent (the "'397 Accused Products"):

Acer EK240Q bi, Acer EK241Y, Acer QG271 Ebii, Acer X35.

In addition, the '397 Accused Products shall include those products identified in SVVTI's

infringement contentions, to be served in accordance with the case scheduling order.

33.      Defendant has directly infringed, and is continuing to directly infringe, literally or

under the doctrine of equivalents, at least claims 1-3, 5, 7, 9-15, 17, 18, and 19 of the '397 patent

by importing into the United States, making, using, selling, and/or offering for sale, at least, the

'397 Accused Products in the United States, in violation of 35 U.S.C. § 271(a).

34.      Alternatively, and in addition, Defendant directly infringes as described in the

preceding paragraph, by making and selling the '397 Accused Products outside of the United

States, delivers those products to its customers, distributors, and/or subsidiaries in the United

States, or in the case that it delivers the Accused Products outside of the United States it does so

intending and/or knowing that those products are destined for the United States and/or designing

those products for sale in the United States, thereby directly infringing. *See, e.g., Lake Cherokee

Hard Drive Techs., L.L.C. v. Marvell Semiconductor, Inc.*, 964 F. Supp. 2d 653, 658 (E.D. Tex.

2013). Furthermore, Defendant directly infringes through its direct involvement in the activities

of its distributors or subsidiaries, including by selling and offering for sale the '397 Accused

Products directly to is distributors or subsidiaries and importing the '397 Accused Products into

the United States. Upon information and belief, Defendant conducts activities that constitutes

direct infringement. Defendant is vicariously liable for this infringing conduct of its distributors

and subsidiaries under both the alter ego and agency theories because, as an example and on

information and belief, Defendant has the right and ability to control its distributors' and

subsidiaries' infringing acts and receives a direct financial benefit from their infringement.

35.     In addition, upon information and belief, since at the least the date when Defendant was on notice of its infringement, Defendant has actively induced, under U.S.C. § 271(b), distributors, customers, subsidiaries, importers, and/or consumers that import, purchase, or sell the '397 Accused Products that include or are made using all of the limitations of one or more claims of the asserted patents, at least as described in the preceding paragraph, to directly infringe one or more claims of the patents by using, offering for sale, selling, and/or importing the '397 Accused Products. Since at least the notice provided on the above-mentioned date, Defendant does so with knowledge, or with willful blindness of the fact, that the induced acts constitute infringement. Upon information and belief, Defendant intends to cause, and has taken affirmative steps to induce infringement by distributors, importers (including inducement to import in violation of § 271(g)), customers, subsidiaries, and/or consumers by, *inter alia*, creating advertisements that promote the infringing use of the '397 Accused Products, creating established distribution channels for the '397 Accused Products into and within the United States, manufacturing the '397 Accused Products in conformity with U.S. laws and regulations, distributing or making available instructions or manuals for these products to purchasers and prospective buyers, and/or providing technical support, replacement parts, or services for these products to these purchasers in the United States.

36.     The '397 Accused Products use an LCD display.  The LCD display includes a backlighting/LCD panel assembly that covers the front side of the monitor and is used to redistribute light emitted by a series of light emitting diode (LED) sources disposed along an edge of the monitor.  The backlighting/LCD panel assembly incorporates generally planar layer of optically transparent material.  The planar layer of optically transparent material (prismatic film) has at least one broad corrugated surface.  The corrugated surface includes highly

transparent optical windows distributed according to a predetermined pattern. For example, each prismatic ridge of the corrugated surface has a smooth horizontal surface at its tip which defines an optical window.  The optical windows are configured for communicating light to or from the planar layer of optically transparent material (prismatic film). For example, the flat-top tips of the prismatic ridges are highly transparent and transmit light in either direction (to and from the prismatic film).  The surface corrugations (prismatic ridges and furrows) are aligned parallel to a reference line (i.e., common longitudinal axis).   The surface corrugations are configured to retroreflect at least some light propagating in the planar layer (prismatic film) by means of a total internal reflection. For example, the prismatic ridges and furrows receive light from the LGP disposed on the back side of the prismatic sheet and retroreflect (reflect light back towards its source with a minimum of scattering) at least on-axis light rays using double reflection from opposite sidewalls of the prismatic ridges.

## COUNT II

## DEFENDANT'S INFRINGEMENT OF U.S. PATENT NO. 9,678,321

37.     On June 13, 2017, United States Patent No. 9,678,321 entitled "Light Trapping Optical Structure" was duly and legally issued after full and fair examination.  SVVTI is the owner of all right, title, and interest in and to the patent by assignment, with full right to bring suit to enforce the patent, including the right to recover for past infringement damages and the right to recover future royalties, damages, and income.  A true copy of the '321 patent is incorporated by reference herein and may be accessed at https://patents.google.com/patent/US9678321B2.

38.     The following products are accused of infringing the '321 Patent (the "'321 Accused Products"):

ACER XV273K Pbmiipprzx.

In addition, the '321 Accused Products shall include those products identified in SVVTI's infringement contentions, to be served in accordance with the case scheduling order.

39.     Defendant has directly infringed, and is continuing to directly infringe, literally or under the doctrine of equivalents, at least claims 1, 2, 4-7, 9, 13, and 15-18 of the '321 patent by importing into the United States, making, using, selling, and/or offering for sale, at least, the '321 Accused Products in the United States, in violation of 35 U.S.C. § 271(a).

40.     Alternatively, and in addition, Defendant directly infringes as described in the preceding paragraph, by making and selling the '321 Accused Products outside of the United States, delivering those products to its customers, distributors, and/or subsidiaries in the United States, or in the case that it delivers the '321 Accused Products outside of the United States it does so intending and/or knowing that those products are destined for the United States and/or designing those products for sale in the United States, thereby directly infringing. *See, e.g., Lake Cherokee Hard Drive Techs., L.L.C. v. Marvell Semiconductor, Inc.*, 964 F. Supp. 2d 653, 658 (E.D. Tex. 2013). Furthermore, Defendant directly infringes through its direct involvement in the activities of its distributors or subsidiaries, including by selling and offering for sale the Accused Products directly to is distributors or subsidiaries and importing the Accused Products into the United States. Upon information and belief, Defendant conducts activities that constitutes direct infringement. Defendant is vicariously liable for this infringing conduct of its distributors and subsidiaries under both the alter ego and agency theories because, as an example and on information and belief, Defendant has the right and ability to control its distributors' and subsidiaries' infringing acts and receives a direct financial benefit from their infringement.

41.     In addition, upon information and belief, since at the least the date when Defendant was on notice of its infringement, Defendant has actively induced, under U.S.C. § 271(b), distributors, customers, subsidiaries, importers, and/or consumers that import, purchase, or sell the '321 Accused Products that include or are made using all of the limitations of one or more claims of the asserted patents, at least as described in the preceding paragraph, to directly infringe one or more claims of the patents by using, offering for sale, selling, and/or importing the '321 Accused Products. Since at least the notice provided on the above-mentioned date, Defendant does so with knowledge, or with willful blindness of the fact, that the induced acts constitute infringement. Upon information and belief, Defendant intends to cause, and has taken affirmative steps to induce infringement by distributors, importers (including inducement to import in violation of § 271(g)), customers, subsidiaries, and/or consumers by, *inter alia*, creating advertisements that promote the infringing use of the '321 Accused Products, creating established distribution channels for the '321 Accused Products into and within the United States, manufacturing the '321 Accused Products in conformity with U.S. laws and regulations, distributing or making available instructions or manuals for these products to purchasers and prospective buyers, and/or providing technical support, replacement parts, or services for these products to these purchasers in the United States.

42.     The '321 Accused Products use an optical structure, specifically, an LCD display. The LCD display includes a backlighting/LCD panel assembly.  The LCD/backlighting panel assembly includes a layer of optically transmissive material (LGP). The LGP is formed by a plastic sheet made from a highly transmissive material (such as optical-grade acrylic). The LGP is defined by a pair of opposing broad area surfaces extending parallel to each other.  The LCD/backlighting panel assembly includes an optically absorptive layer disposed in contact with

the second surface (e.g., front surface of the LGP) and in an energy exchange relationship with the layer of optically transmissive material (LGP). The LCD/backlighting panel assembly contains a plurality of light deflecting elements distributed within the layer of optically transmissive material (LGP). For example, LGP has a large number of microstructures formed in its back surface. Each light deflecting element (microstructure of the back surface of LGP and/or cylindrical lens of the front surface of LGP) deflects at least some light propagating transversally through the layer of optically transmissive material (LGP) away from a surface normal (e.g., a normal to the front or back surface of the LGP) at angles above a predefined critical angle (e.g., a sufficiently high angle with respect to the surface normal). The predefined critical angle is selected to result in a multiple transversal passage of light through said optically absorptive layer. For example, QDEF and the phosphor layer of back reflector absorb only a portion of the blue light in a single pass and it takes more than one pass to absorb and convert the sufficient quantity of the blue light.

## COUNT III

## DEFENDANT'S INFRINGEMENT OF U.S. PATENT NO. 10,613,306

43.     On April 7, 2020, United States Patent No. 10,613,306 entitled "Light Distribution System Employing Planar Microstructured Waveguide" was duly and legally issued after full and fair examination. SVVTI is the owner of all right, title, and interest in and to the patent by assignment, with full right to bring suit to enforce the patent, including the right to recover for past infringement damages and the right to recover future royalties, damages, and income. A true copy of the '306 patent is incorporated by reference herein and may be accessed at https://patents.google.com/patent/US10613306B2.

44.     The following products are accused of infringing the '306 Patent (the "'306

Accused Products"):

Acer A315-24P-R7VH, Acer Iconia Tab M10, Acer XV271 Zbmiiprx, Acer XV271U

M3bmiiprx, Acer XZ270 Xbmiiphx, Acer KG271U Pbiip, and Acer ED320QRbi.

In addition, the '306 Accused Products shall include those products identified in SVVTI's

infringement contentions, to be served in accordance with the case scheduling order.

45.     Defendant has directly infringed, and continues to directly infringe, literally or

under the doctrine of equivalents, at least claims 1, 2, 4, 5, 7, 12, 13, 15, 17-19, 20, 21, 23, 24,

26, 27-31, 33, 34, 38-40, and 42 of the '306 patent by importing into the United States, making,

using, selling, and/or offering for sale, at least, the '306 Accused Products, in the United States,

in violation of 35 U.S.C. § 271(a).

46.     Alternatively, and in addition, Defendant directly infringes as described in the

preceding paragraph, by making and selling the '306 Accused Products outside of the United

States, delivers those products to its customers, distributors, and/or subsidiaries in the United

States, or in the case that it delivers the '306 Accused Products outside of the United States it

does so intending and/or knowing that those products are destined for the United States and/or

designing those products for sale in the United States, thereby directly infringing. *See, e.g., Lake

Cherokee Hard Drive Techs., L.L.C. v. Marvell Semiconductor, Inc.*, 964 F. Supp. 2d 653, 658

(E.D. Tex. 2013). Furthermore, Defendant directly infringes through its direct involvement in the

activities of its distributors or subsidiaries, including by selling and offering for sale the '089

Accused Products directly to is distributors or subsidiaries and importing the '306 Accused

Products into the United States. Upon information and belief, Defendant conducts activities that

constitutes direct infringement. Defendant is vicariously liable for this infringing conduct of its

distributors and subsidiaries under both the alter ego and agency theories because, as an example and on information and belief, Defendant has the right and ability to control its distributors' and subsidiaries' infringing acts and receives a direct financial benefit from their infringement.

47.    In addition, upon information and belief, since at the least the date when Defendant was on notice of its infringement, Defendant has actively induced, under U.S.C. § 271(b), distributors, customers, subsidiaries, importers, and/or consumers that import, purchase, or sell the '306 Accused Products that include or are made using all of the limitations of one or more claims of the asserted patents, at least as described in the preceding paragraph, to directly infringe one or more claims of the patents by using, offering for sale, selling, and/or importing the '306 Accused Products. Since at least the notice provided on the above-mentioned date, Defendant does so with knowledge, or with willful blindness of the fact, that the induced acts constitute infringement. Upon information and belief, Defendant intends to cause, and has taken affirmative steps to induce infringement by distributors, importers (including inducement to import in violation of § 271(g)), customers, subsidiaries, and/or consumers by, *inter alia*, creating advertisements that promote the infringing use of the '306 Accused Products, creating established distribution channels for the '306 Accused Products into and within the United States, manufacturing the '306 Accused Products in conformity with U.S. laws and regulations, distributing or making available instructions or manuals for these products to purchasers and prospective buyers, and/or providing technical support, replacement parts, or services for these products to these purchasers in the United States.

48.    The '306 Accused Products use a light distribution optical system, specifically, a LCD display. The LCD display incorporates a liquid crystal display (LCD) which is backlit using a backlighting panel assembly (backlight). The backlight uses multiple light-emitting

diodes (LEDs) which are placed along an edge of the visible area of the display and provide a light source. The light distribution optical system (display) incorporates a flexible optically transmissive sheet having a first broad-area surface and an opposing second broad-area surface. For example, the backlighting/LCD panel assembly contains a light guiding plate (LGP) formed by a thin, optically transmissive plastic sheet. The display also incorporates an artificial light source illuminating the optically transmissive sheet (LGP). For example, as explained above, the backlighting/LCD panel assembly of the display contains LEDs that are used as a light source. The LEDs illuminate the optically transmissive sheet (LGP) from an edge. The display also contains a plurality of cylindrical lenses formed in the first broad-area surface (front surface of LGP) and aligned parallel to an edge of the optically transmissive sheet (LGP). For example, the cylindrical lenses are incorporated into a linear array and aligned parallel to the bottom and top edges of LGP. The display incorporates a plurality of discrete cavities formed in the second broad-area surface (back surface of LGP) and distributed over an area of the second broad-area surface (back surface of LGP) according to a predetermined two-dimensional pattern. For example, the back surface of LGP has a two-dimensional pattern of microscopic cavities which are discrete (e.g., individually separate and distinct) and which are formed directly in the back surface. The two-dimensional pattern is predetermined (e.g., specifically designed to uniformly extract light from the LGP). Each of the plurality of discrete cavities is disposed in optical communication with respect to at least one of the plurality of cylindrical lenses. For example, each cavity receives light from one or more cylindrical lenses as the light is reflected from the cylindrical lenses while being guided within LGP. In addition, each cavity redirects at least a portion of light that enters the cavity towards one or more cylindrical lenses while extracting light from LGP. The display incorporates a planar reflective surface extending parallel to the

optically transmissive sheet (LGP) and disposed in an energy receiving relationship with respect to the optically transmissive sheet (LGP). For example, the backlight includes a planar reflector on the back of LGP. The back reflector extends parallel to LGP and is used to receive and reflect light emerging from the LGP.  A light receiving aperture of each of the plurality of discrete cavities is less than a spacing distance between adjacent ones of the plurality of discrete cavities. Furthermore, a cumulative area of the cavities is less than areas of each of the first and second broad-area surfaces (front and back surfaces of LGP). For example, each cavity within the respective two-dimensional pattern has a size which is less than the spacing distances between adjacent cavities.  A thickness of the optically transmissive sheet (LGP) is between a fraction of a millimeter and several millimeters. For example, measurements made using a digital caliper indicate that the LGP has a thickness of about 3 mm.  A width and/or length of the optically transmissive sheet (LGP) is 100 millimeters or more. For example, the LGP has a length and width in excess of 100 mm.  The plurality of cylindrical lenses defines a lenticular lens array. For example, each cylindrical lens forms a lenticular lens. A large number of such lenticular lenses are disposed side by side, forming a lenticular lens array.  The plurality of discrete cavities is disposed in a proximity to the focal plane. For example, the cavities, which are formed in the back surface of LGP, are very close to the focal plane of the lenticular lens, within a distance of the order of only several hundred micrometers.

## COUNT IV

## DEFENDANT'S INFRINGEMENT OF U.S. PATENT NO. 10,868,205

49.    On October 6, 2020, United States Patent No. 10,868,205 entitled "Light Converting System Employing Planar Light Trapping and Light Absorbing Structures" was duly and legally issued after full and fair examination.  SVVTI is the owner of all right, title, and

interest in and to the patent by assignment, with full right to bring suit to enforce the patent, including the right to recover for past infringement damages and the right to recover future royalties, damages, and income.  A true copy of the '205 patent is incorporated by reference herein and may be accessed at https://patents.google.com/patent/US10868205B2.

50.     The following products are accused of infringing the '205 Patent (the "'205 Accused Products"):

        Acer XV273K Pbmiipprzx.

In addition, the '205 Accused Products shall include those products identified in SVVTI's infringement contentions, to be served in accordance with the case scheduling order.

51.     Defendant has directly infringed, and continues to directly infringe, literally or under the doctrine of equivalents, at least claims 1-6, 11-17, and 19 of the '205 Patent by importing into the United States, making, using, selling, and/or offering for sale, at least, the '205 Accused Products, in the United States, in violation of 35 U.S.C. § 271(a).  Defendant has directly infringed, and continues to directly infringe, literally or under the doctrine of equivalents, at least independent claim 20 of the '205 patent by importing into the United States, at least, the '205 Accused Products, in violation of 35 U.S.C. § 271(g).

52.     Alternatively, and in addition, Defendant directly infringes as described in the preceding paragraph, by making and selling the '205 Accused Products outside of the United States, delivers those products to its customers, distributors, and/or subsidiaries in the United States, or in the case that it delivers the '205 Accused Products outside of the United States it does so intending and/or knowing that those products are destined for the United States and/or designing those products for sale in the United States, thereby directly infringing. *See, e.g., Lake Cherokee Hard Drive Techs., L.L.C. v. Marvell Semiconductor, Inc.*, 964 F. Supp. 2d 653, 658

(E.D. Tex. 2013). Furthermore, Defendant directly infringes through its direct involvement in the activities of its distributors or subsidiaries, including by selling and offering for sale the '205 Accused Products directly to is distributors or subsidiaries and importing the '205 Accused Products into the United States. Upon information and belief, Defendant conducts activities that constitutes direct infringement. Defendant is vicariously liable for this infringing conduct of its distributors and subsidiaries under both the alter ego and agency theories because, as an example and on information and belief, Defendant has the right and ability to control its distributors' and subsidiaries' infringing acts and receives a direct financial benefit from their infringement.

53.    In addition, upon information and belief, since at the least the date when Defendant was on notice of its infringement, Defendant has actively induced, under U.S.C. § 271(b), distributors, customers, subsidiaries, importers, and/or consumers that import, purchase, or sell the '205 Accused Products that include or are made using all of the limitations of one or more claims of the asserted patents, at least as described in the preceding paragraph, to directly infringe one or more claims of the patents by using, offering for sale, selling, and/or importing the '205 Accused Products. Since at least the notice provided on the above-mentioned date, Defendant does so with knowledge, or with willful blindness of the fact, that the induced acts constitute infringement. Upon information and belief, Defendant intends to cause, and has taken affirmative steps to induce infringement by distributors, importers (including inducement to import in violation of § 271(g), customers, subsidiaries, and/or consumers by, *inter alia*, creating advertisements that promote the infringing use of the '205 Accused Products, creating established distribution channels for the '205 Accused Products into and within the United States, manufacturing the '205 Accused Products in conformity with U.S. laws and regulations, distributing or making available instructions or manuals for these products to purchasers and

prospective buyers, and/or providing technical support, replacement parts, or services for these products to these purchasers in the United States.

54.    The '205 Accused Products use a light converting optical system, specifically, a LCD display. The LCD display incorporates a liquid crystal display (LCD) which is backlit using a backlighting assembly (backlight). The backlight uses multiple light-emitting diodes (LEDs) which are placed along an edge of the visible area of the display and provide a light source. The LEDs emit blue light, a portion of which is absorbed and converted to other wavelengths within the backlight.  The LCD/backlighting panel assembly of the display includes a first broad-area reflective surface comprising a plurality of linear light deflecting surface relief structures and configured for reflecting light using a total internal reflection. For example, the display includes a composite prism sheet which has a plurality of linear light deflecting surface relief features that are configured to deflect light using total internal reflection depending on the propagation angles of light rays passing through the composite prism sheet. Specifically, each surface relief feature of the prism sheet has a pair of facets inclined at a 45°. Each facet reflects light that arrives from a perpendicular direction using total internal reflection.  The LCD/backlighting panel assembly of the display includes a second broad-area reflective surface extending parallel to and being substantially coextensive with the first broad-area reflective surface. For example, the LCD/backlighting panel includes a back reflector which extends parallel to the composite prism sheet and is substantially coextensive with the composite prism sheet.   The LCD/backlighting panel assembly includes a generally planar photoresponsive layer disposed between the first and second broad-area reflective surfaces. For example, a Quantum Dot Enhancement Film (QDEF) is disposed between the composite prism sheet and the reflector.  The QDEF contains an active layer which is responsive to blue light emitted by the

LEDs of the LCD/backlighting panel assembly. The photoresponsive layer includes quantum dots distributed within an optically transmissive material. For example, QDEF includes an active layer which is distributed with quantum dots. The quantum dots are used to absorb blue light emitted by the LEDs and to re-emit the absorbed light energy as light of other color. At least some of the quantum dots are configured to absorb and convert light selectively such that at least a substantial portion of light in a first spectral range is absorbed and converted and light in a second spectral range is transmitted. For example, the active layer of QDEF includes "green" quantum dots that absorb and convert blue light (first spectral range) into green (second spectral range), and "red" quantum dots that absorb and convert blue light into red (second spectral range). Additionally, QDEF transmits at least some light without absorption in a single pass. The LCD/backlighting assembly of the display contains LEDs that are used as a light source. The LEDs are a monochromatic light source (e.g., emitting light only in one color) which is configured to emit light in the first spectral range (the LEDs emit light in blue color when powered on). The LCD/backlighting assembly of the display includes a planar array of lenses distributed over an area of the photoresponsive layer and disposed on a light path between the light source and the photoresponsive layer. For example, the LCD/backlighting assembly includes a light guiding plate (LGP), the front surface of which has a planar array of lenses. The LGP is positioned over an area of the QDEF and receives light from the LEDs. The surface relief structures of the composite prism sheet have facets inclined at a 45°. Each facet reflects light that arrives on it at a sufficiently high angle away from the original propagation direction. The thickness of the photoresponsive layer (QDEF) is less than a minimum thickness sufficient for absorbing substantially all received light in a single pass at normal incidence. For example, QDEF transmits at least some light without absorption in a single pass. The first and second

broad-area reflective surfaces form a light trapping structure configured to provide for multiple transverse light passage through the photoresponsive layer.  For example, at least a portion of the light emitted from the LEDs passes through the QDEF, and gets reflected from the composite prism sheet back to the QDEF. Similarly, at least a portion of the light entering QDEF from the composite prism sheet escapes the QDEF (since QDEF absorbs only a portion of light in a single pass) and then gets reflected back to it from the reflector. Thus, the composite prism sheet and the reflector form a light trapping structure configured to provide multiple transverse light passage through the QDEF.

### COUNT V

### DEFENDANT'S INFRINGEMENT OF U.S. PATENT NO. 11,616,157

55.    On March 28, 2023, United States Patent No. 11,616,157 entitled "Method of Making Light Converting Systems Using Thin Light Absorbing and Light Trapping Structures" was duly and legally issued after full and fair examination.  SVVTI is the owner of all right, title, and interest in and to the patent by assignment, with full right to bring suit to enforce the patent, including the right to recover for past infringement damages and the right to recover future royalties, damages, and income.  A true copy of the '157 patent is incorporated by reference herein and may be accessed at https://patents.google.com/patent/US11616157B2.

56.    The following products are accused of infringing the '157 Patent (the "'157 Accused Products"):

Acer X35.

In addition, the '157 Accused Products shall include those products identified in SVVTI's infringement contentions, to be served in accordance with the case scheduling order.

57.     Defendant has directly infringed, and continues to directly infringe, literally or under the doctrine of equivalents, at least claims 1, 7, 9-16, and 19-20 of the '157 patent by importing into the United States, at least, the '157 Accused Products, in violation of 35 U.S.C. § 271(g).

58.     Alternatively, and in addition, Defendant directly infringes as described in the preceding paragraph, by making and selling the '157 Accused Products outside of the United States, delivers those products to its customers, distributors, and/or subsidiaries in the United States, or in the case that it delivers the '157 Accused Products outside of the United States it does so intending and/or knowing that those products are destined for the United States and/or designing those products for sale in the United States, thereby directly infringing. *See, e.g., Lake Cherokee Hard Drive Techs., L.L.C. v. Marvell Semiconductor, Inc.*, 964 F. Supp. 2d 653, 658 (E.D. Tex. 2013). Furthermore, Defendant directly infringes through its direct involvement in the activities of its distributors or subsidiaries, including by selling and offering for sale the '157 Accused Products directly to is distributors or subsidiaries and importing the '157 Accused Products into the United States. Upon information and belief, Defendant conducts activities that constitutes direct infringement. Defendant is vicariously liable for this infringing conduct of its distributors and subsidiaries under both the alter ego and agency theories because, as an example and on information and belief, Defendant has the right and ability to control its distributors' and subsidiaries' infringing acts and receives a direct financial benefit from their infringement.

59.     In addition, upon information and belief, since at the least the date when Defendant was on notice of its infringement, Defendant has actively induced, under U.S.C. § 271(b), distributors, customers, subsidiaries, importers, and/or consumers that import, purchase, or sell the '157 Accused Products that include or are made using all of the limitations of one or

more claims of the asserted patents, at least as described in the preceding paragraph, to directly infringe one or more claims of the patents by using, offering for sale, selling, and/or importing the '157 Accused Products. Since at least the notice provided on the above-mentioned date, Defendant does so with knowledge, or with willful blindness of the fact, that the induced acts constitute infringement. Upon information and belief, Defendant intends to cause, and has taken affirmative steps to induce infringement by distributors, importers (including inducement to import in violation of § 271(g)), customers, subsidiaries, and/or consumers by, *inter alia*, creating advertisements that promote the infringing use of the '157 Accused Products, creating established distribution channels for the '157 Accused Products into and within the United States, manufacturing the '157 Accused Products in conformity with U.S. laws and regulations, distributing or making available instructions or manuals for these products to purchasers and prospective buyers, and/or providing technical support, replacement parts, or services for these products to these purchasers in the United States.

60.     The '157 Accused Products use a light converting optical system, specifically, an LCD display. The LCD display is made by using the method recited in claim 1. The display incorporates a liquid crystal display (LCD) which is backlit using a backlighting assembly (backlight). The backlight uses multiple light-emitting diodes (LEDs) which are distributed over the viewable area of the display and provide a light source. The LEDs emit blue light, a portion of which is absorbed and converted to other wavelengths within the backlight. The LCD/backlighting assembly contains a first optical layer having a first microstructured broad-area front surface and at least two edges. Specifically, the LCD/backlighting assembly includes Brightness Enhancement Films (BEFs). The front surface of the BEF has a regular pattern formed by microscopic linear grooves (i.e., microstructures) disposed side by side. Further, the

BEF is a rectangular sheet having four edges. The first microstructured broad-area front surface of the first optical layer comprises an array of linear grooves disposed side by side and extends along a straight line between the two edges. As mentioned above, the front surface of the BEF has a regular pattern formed by microscopic linear grooves disposed side by side. Further, the linear grooves extend along the length of the BEF, thus extending between two edges of the BEF. Each of the linear grooves has a triangular cross section and is configured to reflect first light rays having first incidence angles with respect to a surface normal using a total internal reflection and deflect second light rays having second incidence angles with respect to the surface normal using refraction. For example, each linear groove of the BEF has a pair of facets inclined at a 45°. Each facet reflects light that arrives from a perpendicular direction using total internal reflection and refracts light that strikes the BEF at slanted angles. The LCD/backlighting assembly contains a thin sheet of reflective light scattering material approximately coextensive with the first optical layer. For example, the LCD/backlighting assembly contains a reflective surface (reflector sheet) which is made of a thin sheet of reflective light scattering material which is coextensive with and oriented parallel to the BEF. As mentioned above, the thin sheet of reflective light scattering material (i.e., the reflector sheet) is positioned parallel to the first optical layer (i.e., the BEF). The LCD/backlighting assembly contains a light source configured to emit light in a visible spectrum. Specifically, the LCD/backlighting assembly of the display contains LEDs that are used as a light source. The LEDs are a monochromatic (e.g., emitting light only in one color) light source which is configured to emit light in a visible spectrum (the LEDs emit light in blue color when powered on). The LCD/backlighting assembly comprises a second optical layer approximately coextensive with the first optical layer and having a second microstructured broad-area front

surface.  Specifically, the LCD/backlighting assembly contains a diffuser which is positioned

coextensive with the first optical layer (i.e., the BEF). The front surface of the diffuser has a

microstructured broad-area.  The LCD/backlighting assembly comprises a continuous broad-area

photoabsorptive film layer approximately coextensive with the first optical layer. For example,

the backlight contains a Quantum Dot Enhancement Film (QDEF) which is retained in a planar

form within the backlight and contains an active layer which absorbs blue light emitted by the

LEDs and converts it to light of other colors, such as red and green colors.  The photoabsorptive

layer is positioned coextensive with the first optical layer, i.e., the BEF.  The photoabsorptive

layer comprises an active layer having a first light converting semiconductor material having a

first bandgap (e.g., "red" quantum dots that convert blue light into light in red spectral band) and

a second light converting semiconductor material having a second bandgap (e.g., "green"

quantum dots that convert blue light into light in green spectral band) which is different than the

first bandgap.  For example, QDEF includes an active (core) layer that includes a semiconductor

material in the form of quantum dots. Quantum dots are nano-sized crystals made of

semiconductor materials. The quantum dots are configured to absorb and convert light in the

preselected spectral range (e.g., in the spectral range of blue light emitted by the LEDs). For

example, the quantum dots are used to absorb blue light emitted by the LEDs and re-emit the

absorbed light energy in other spectral bands of light (e.g., red and/or green colors).  Further,

quantum dots have bandgaps that are tunable across a wide range of energy levels by changing

their size . As mentioned above, QDEF incorporated into the LCD/backlighting assembly

includes two groups of quantum dots: "green" and "red" which emit light in green and red

colors, respectively, based on the size of quantum dot. The "green" and "red" quantum dots have

different sizes and hence different band gaps.  The first and second light converting

semiconductor materials comprises quantum dots distributed within an optically transmissive material. As described above, the active layer of QDEF (i.e., the optically transmissive material) comprises "red" quantum dots that convert blue light into light in red spectral band, and "green" quantum dots that convert blue light into light in green spectral band. The red and green quantum dots are distributed within the active layer of QDEF.  Each of the first (e.g. "red" quantum dots) and second (e.g. "green" quantum dots) light converting semiconductor materials is configured to absorb light selectively such that photons with a higher energy (e.g., blue light emitted from the LEDs) are at least partially absorbed and photons with a lower energy are transmitted without appreciable absorption.  For example, the second light semiconductor material (e.g., "green" quantum dots) are configured to absorb a first portion of light with a higher energy (e.g., a portion of blue light propagating through QDEF) and transmit at least a second portion of the light towards the first light converting semiconductor materials (e.g. "red" quantum dots). The light absorbed by the green quantum dots is converted and transmitted as green light (photons with lower energy).  Similarly, the first light converting element (e.g., "red" quantum dots") is configured to absorb and convert at least a part of the second portion of the light. For example, "red" quantum dots absorb and convert (into red light) a part of the remaining blue light which has not been absorbed/converted by "green" quantum dots.  Unabsorbed blue light is transmitted through the QDEF in a single pass.  The thickness of the photoabsorptive film layer is less than a minimum thickness sufficient for absorbing substantially all light in the visible spectrum traversing through the continuous broad-area photoabsorptive film layer.  The QDEF transmits at least some light without absorption in a single pass.  The continuous broad-area photoabsorptive film layer (i.e., QDEF) is positioned between and parallel to the first optical layer (i.e., the BEFs) and the thin sheet of reflective material (i.e., the reflector sheet).  The second optical layer, i.e.,

the diffuser, is positioned on a light path between the light source (i.e., the LEDs) and the continuous broad-area photoabsorptive film layer (i.e., the QDEF). For example, as shown below, the diffuser to positioned between the LEDs and the QDEF. Further, the LEDs are configured to emit light towards the QDEF. Thus, the diffuser is positioned on a light path between the LEDs and the QDEF.

## **FURTHER ASSERTIONS INVOLVING ALL CLAIMS**

61.     The Asserted Patents are valid and enforceable.

62.     Defendant has been aware of the '397 Patent, '321 Patent, '306 Patent, and '205 Patent since, at least, January 29, 2021, when Acer received a letter from SVVTI, dated January 22, 2021, introducing SVVTI, and notifying Acer of several of the patents identified below, and identifying several of Acer's products that utilize SVVTI's intellectual property. In particular, the January 22, 2021 letter identified United States Patent Nos. 8,290,318; 8,740,397; 9,678,321; 9,097,826; 9,256,007; 9,880,342; 10,269,999; 10,439,088; 10,439,089; 10,613,306; 10,627,562; 10,797,191; 10,838,135; and 10,868,205.

63.     Defendant has been aware of the '397 Patent, '321 Patent, '306 Patent, and '205 Patent since, at least, June 21, 2021 when SVVTI filed three patent infringement lawsuits against Acer, styled *SVV Technology Innovations, Inc. v. Acer Inc*., No. 6:22-cv-639-ADA (W.D. Tex.), *SVV Technology Innovations, Inc. v. Acer Inc*., No. 6:22-cv-640-ADA (W.D. Tex.), and *SVV Technology Innovations, Inc. v. Acer Inc*., No. 6:22-cv-641-ADA (W.D. Tex.). Those cases collectively accused Acer of infringement involving the '397 Patent, '321 Patent, '306 Patent, and '205 Patent.

64.     Alternatively, Defendant has had knowledge of the Asserted Patents since, at least, the filing date of the original complaint in this action.

65.    Defendant's affirmative acts of selling the Accused Products, causing the Accused Products to be sold, advertised, offered for sale, and/or distributed, and providing instruction manuals for the Accused Products have induced and continue to induce Defendant's customers, and/or end-users to use the Accused Products in their normal and customary way to infringe the Asserted Patents.  For example, it can be reasonably inferred that end-users will use the infringing products, which will cause the end-users to use the elements that are the subject of the claimed invention.  Defendant specifically intended and was aware that these normal and customary activities would infringe the Asserted Patents.  In addition, Defendant provides marketing and/or instructional materials, such as user guides, that specifically teach end-users to use the Accused Products in an infringing manner.  By providing such instructions, Defendant knows (and has known), or was willfully blind to the probability that its actions have, and continue to, actively induce infringement.  By way of example only, Defendant has induced infringement and continue to induce infringement of, in addition to other claims, at least the specific claims identified above of the Asserted Patents by selling in the United States, without SVVTI's authority, infringing products and providing instructional materials.  These actions have induced and continue to induce the direct infringement of the Asserted Patents by end-users.  Defendant performed acts that constitute induced infringement, and would induce actual infringement, with the knowledge of the Asserted Patents and with the knowledge, or willful blindness to the probability, that the induced acts would constitute infringement.  Upon information and belief, Defendant specifically intended (and intends) that its actions would result in infringement of at least the specific claims identified above of the Asserted Patents, or subjectively believed that its actions would result in infringement of the Asserted Patents but took deliberate actions to avoid learning of those facts, as set forth above.  Upon information and

belief, Defendant knew of the Asserted Patents and knew of its infringement, including by way of this lawsuit as described above.

66.    Defendant's infringement has been and continues to be willful and deliberate. Upon information and belief, Defendant deliberately infringed the Asserted Patents and acted recklessly and in disregard to the Asserted Patents by making, having made, using, importing, and offering for sale products that infringe the Asserted Patents.  Upon information and belief, the risks of infringement were known to Defendant and/or were so obvious under the circumstances that the infringement risks should have been known.  Upon information and belief, Defendant has no reasonable non-infringement theories.  Upon information and belief, Defendant has not attempted any design/sourcing change to avoid infringement.  Defendant has acted despite an objectively high likelihood that its actions constituted infringement of the Asserted Patents.  In addition, this objectively-defined risk was known or should have been known to Defendant.  Upon information and belief, Defendant has willfully infringed and/or continues to willfully infringe the Asserted Patents.  Defendant exhibited egregious behavior beyond typical infringement in that, despite being aware of its infringement, defendant did not develop any non-infringement theories, did not attempt any design or sourcing change, and did not otherwise cease its infringement.

67.    To the extent any marking or notice was required by 35 U.S.C. § 287, Plaintiff has complied with the applicable marking and/or notice requirements of 35 U.S.C. § 287.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury for all issues so triable.

## PRAYER

WHEREFORE, Plaintiff prays for judgment that:

1.      Defendant has infringed and continues to infringe, one or more claims of the Asserted

Patents;

2.      Defendant be ordered to pay damages caused to Plaintiff by Defendant's unlawful acts of

infringement;

3.      Defendant's acts of infringement have been, and are, willful;

4.      Plaintiff recover actual damages under 35 U.S.C. § 284;

5.      Plaintiff be awarded supplemental damages for any continuing post-verdict infringement

up until final judgment;

6.      Plaintiff be awarded a compulsory ongoing royalty;

7.      Plaintiff be awarded an accounting of damages;

8.      Plaintiff be awarded enhanced damages for willful infringement as permitted under the

law;

9.      A judgment and order requiring Defendant to pay to Plaintiff pre-judgment and post-

judgment interest on the damages awarded, including an award of pre-judgment interest,

pursuant to 35 U.S.C. § 284, from the date of each act of infringement by Defendant to the day a

damages judgment is entered, and a further award of post-judgment interest, pursuant to 28

U.S.C. § 1961, continuing until such judgment is paid, at the maximum rate allowed by law;

10.     An award to Plaintiff of the costs of this action and its reasonable attorneys' fees pursuant

to 35 U.S.C. §285; and

11.     Such other and further relied as the Court deems just and equitable.

DATED: October 10, 2024                    Respectfully submitted,

                                           /s/*Robert D. Katz*
                                           Robert D. Katz
                                           Texas Bar No. 24057936
                                           KATZ PLLC
                                           6060 N. Central Expressway, Suite 560
                                           Dallas, TX 75206
                                           214-865-8000
                                           888-231-5775 (fax)
                                           rkatz@katzfirm.com

                                           **ATTORNEY FOR PLAINTIFF
                                           SVV TECHNOLOGY INNOVATIONS INC.**